RALSTON and others, Trustees, *v.* CRITTENDEN, Governor, and others.*

*(Circuit Court, W. D. Missouri, E. D.* August 8, 1882.)

1. EQUITY—ACCOUNTING—INTEREST ACT OF MARCH 26, 1881.

Under the provisions of the act of the general assembly of Missouri of March 26, 1881, it was the duty of the state officials to invest the $3,000,000 paid in by the Hannibal & St. Joseph Railroad Company as soon as practicable in the bonds and securities specified in said act, or some of them, and so save to the state as large a sum as possible, which sum so saved would have constituted, as between the state and complainants, a credit *pro tanto* upon the unmatured coupons now in controversy; and the state, in adjusting its claim against said railroad, must be held liable and chargeable with what could have been saved to the state by the investment of said $3,000,000 within a reasonable time after its payment. The sale of the railroad for the amount of interest due on coupons, which amounts to less than the sum which the company must pay in order to discharge its liability to the state, will be enjoined; and, upon the payment of interest due, such payment will be taken into account by the master to whom the case is referred in adjusting the account.

2. STATUTES—WHEN MANDATORY.

Even if the terms of a statute are permissive only, and mean no more than the words generally employed in statutes, importing a grant of authority or power to a public officer to do a certain act, still it is well settled that all such acts are to be construed as mandatory whenever the public interests or *individual rights* call for the exercise of the power conferred.

*See 7 Sup. Ct. Rep. 599.

*John F. Dillon, Elihu Root, Wager Swayne,* and *George W. Easley,* for complainants.

*Glover & Shepley, Henderson & Shields,* and *D. H. McIntyre,* Atty. Gen., for respondents.

McCRARY, C. J. By a series of legislative acts, beginning with the act approved February 22, 1851, and ending with that of March 26, 1881, the state of Missouri aided with great liberality in the construction of a system of railroads in that state.

Among the enterprises thus largely assisted was the Hannibal & St. Joseph Railroad, for the construction of which the bonds of the state to the amount of $3,000,000, bearing interest at 6 per cent. per annum, payable semi-annually, were issued. One-half of this amount was issued under the act of 1851, and the remainder under the act of 1855. The bonds issued under the former act were to run 20 years, and those under the latter act were to run 30 years. Some of the bonds have since been funded and renewed. Coupons for the interest on the entire $3,000,000 were executed and made payable in New York. These acts contain numerous provisions intended to secure the state against loss, and to require the railroad company to pay the interest and principal at maturity. Upon the hearing of the application for a preliminary injunction in this case, the question of the true construction and effect of this leglislation was fully considered, and the conclusion reached, as announced by Mr. Justice Miller, was, that it was made the duty of the railroad company to save and keep the state from all loss on account of said bonds and coupons. The treasury of the state was to be exonerated from any advance of money to meet either principal or interest. The state contracted with the railroad company for complete indemnity. She was required to assign her statutory mortgage lien only upon payment into the treasury of a sum of money equal to all indebtedness due or owing by said company to the state, and all liabilities incurred by the state by reason of having issued her bonds and loaned them to the company. The unpaid and unmatured coupons constituted a liability of the state, and a debt owing, though not due, and until these are provided for, the state is not bound to assign her lien upon the road. Such was the view of the statutes taken by the court upon the former hearing, and I am not disposed to depart from it.

Another question which was mooted at the former hearing, but not decided, is now, by the amended bill, presented for determination. It is this: What, if any, account is the state to render of the use of the $3,000,000 paid into the treasury by the complainants on the

twentieth of June, 1881? Can she hold that large sum of money, refusing to make any account of it, and still insist upon full payment by the railroad company of all outstanding coupons?

Upon this subject Mr. Justice Miller, in the course of his opinion upon the former hearing, said:

"I am of the opinion that the state, having accepted or got this money into her possession, is under a moral obligation (and I do not pretend to commit anybody as to how far its legal obligation goes) to so use that money as, so far as possible, to protect the parties who have paid it against the loss of the interest which it might accumulate, and which would go to extinguish the interest on the state's obligations."

In order to determine whether this obligation is one which may be enforced by a court of equity, it is necessary to consider the force and effect of the act of the general assembly of Missouri, approved March 26, 1881, and which is as follows:

"An act to provide for the transfer to the state sinking fund any surplus money that may be in the state treasury, not necessary to defray the current expenses of the state government, and to meet the appropriations made by law, and to authorize the fund commissioners to invest the same in the redemption or purchase of bonds of the state and bonds of the United States, Hannibal & St. Joseph bonds excepted.

"Be it enacted by the general assembly of the state of Missouri, as follows:

"Section 1. Whenever there is any money in the state treasury not necessary to defray the current expenses of the state government, and to meet the appropriations made by law, it shall be the duty of the state auditor, and he is hereby authorized and required to transfer the same to the credit of the state sinking fund, for the purpose of paying the state debt, or any portion thereof, and the interest thereon as it becomes due.

"Sec. 2. Whenever there is sufficient money in the sinking fund to redeem or purchase one or more of the bonds of the state of Missouri, such sum is hereby appropriated for such purpose, and the fund commissioners shall immediately call in for payment a like amount of the option bonds of the state, known as '5-20 bonds,' provided that if there are no option bonds which can be called in for payment, they may invest such money in the purchase of any of the bonds of the state, or bonds of the United States, the Hannibal & St. Joseph railroad bonds excepted.

"Approved March 26, 1881."

This act was passed in response to a special message of Governor Crittenden, dated February 25, 1881, in which he informed the legislature of the purpose of the Hannibal & St. Joseph Company to discharge the full amount of "what it claims is its present indebtedness to the state," and advised that provision be made for the "profitable disposal" of the sum when paid. It will be seen that the act not

only authorized, but required, the auditor to transfer the sum when received "to the credit of the state sinking fund for the purpose of paying the state debt, or any portion thereof, and the interest thereon as it becomes due."

And it furthermore required the fund commissioners, whenever there should be in the sinking fund a sum sufficient to purchase one or more of the bonds of the state, immediately to call in for payment option bonds of the state, known as "5-20 bonds," provided that if no such bonds are subject to call, the money may be invested in the purchase of bonds of the state or bonds of the United States. The purpose of this enactment evidently was to enable the officials of the state to receive the $3,000,000, and to immediately invest in the securities named, or some of them. Under the constitution of the state, no money can be drawn from the treasury except in pursuance of an appropriation, and as it was foreseen that this sum might be received at a time when the legislature was not in session, the act made the necessary appropriation in advance. The legislature wisely determined that so large a sum should not be allowed to remain in the treasury for an indefinite period unused and earning no income. It is true that the act does not specifically mention the $3,000,000 to be paid on account of the state aid bonds issued to the Hannibal & St. Joseph Railroad Company, but it clearly appears that it was passed with direct reference to that fund, and in response to the message of the governor asking that provision be made for its investment. The act was undoubtedly a part of the legislation relating to this loan, and if it did not enter into and become a part of the contract between the parties in interest, it was, at all events, binding upon the state, and the complainants had a right to rely upon it, and to pay their money to the treasurer upon the faith of it, and with the expectation that it would be obeyed and executed. Can the state disregard it, and still hold the railroad company bound for the unmatured interest to the same extent as if the $3,000,000 had not been paid? That such a view of the rights and duties of the state would be in the last degree inequitable, is too plain for argument. The state aid bonds have an average of about 10 years to run, so that the interest to be provided for amounts to about $1,800,000. The $3,000,-000 now in the state treasury paid by complainants will produce nearly the whole of this sum if the officers of the state will invest it in obedience to the positive requirements of the statute. By executing the law the state can save this large sum to complainants and

still receive all that is due her. That she ought to do so upon principles of justice and equity, to say nothing of the binding force of the statute, is entirely clear. Interest is a sum paid for the use of money. It presupposes that the party paying the interest has the use of the principal. If the state is not bound to invest the $3,000,000, and account for the profits of the investment, it follows that the state has the principal sum and pays no interest, while the complainants pay interest for 10 years upon $3,000,000, the use of which is enjoyed by the state. To this it has been answered by counsel for the state: *First,* that the statute imposes merely a duty upon the state auditor as between that officer and the state; and, *second,* that the $3,000,-000 was not paid with any agreement or understanding that it should be invested in accordance with the act of March last.

In substance it is claimed that in so far as the rights of complainants are concerned the state officers were at liberty to disregard the act. In this view I do not concur. Even if the terms of the statute were permissive only, and meant no more than the words generally employed in statutes importing a grant of authority or power to a public officer to do a certain act, still it is well settled that all such acts are to be construed as mandatory, whenever the public interests *or individual rights* call for the exercise of the power conferred. *Sup'rs* v. *U. S.* 4 Wall. 435; *Galena* v. *Amy,* 5 Wall. 705; *McDougall* v. *Peterson,* 11 C. B. 755; 15 Op. Atty. Gen. U. S. 621. But the terms of the act are clearly mandatory. The auditor is "authorized and *required*" to transfer the money to the credit of the sinking fund, and it is declared that upon such transfer "the fund commissioners *shall immediately* call in for payment a like amount of the option bonds of the state known as '5-20 bonds.'"

My conclusions upon the law of this case are: *First,* that the payment by complainants into the treasury of the state of the sum of $3,000,000 on the twentieth of June, 1881, did not satisfy the claim of the state in full, nor entitle complainants to an assignment of the state's statutory mortgage; *second,* that the state was bound to invest the principal sum of $3,000,000 so paid by complainants, without unnecessary delay, in the securities named in the act of March 26, 1881, or some of them, and so as to save to the state as large a sum as possible, which sum so saved would have constituted, as between the state and complainants, a credit *pro tanto* upon the unmatured coupons now in controversy; *third,* that the rights and equities of the parties are to be determined upon the foregoing principles,

and the state must stand charged with what would have been realized if the act of March, 1881, had been complied with.

It only remains to consider what the rights of the parties are upon the principles here stated. In order to save the state from loss on account of the default of the railroad company, a further sum must be paid. In order to determine what that further sum is an accounting must be had. The question to be settled by the accounting is, how much would the state have lost if the provisions of the act of March, 1881, had been complied with. That act provided for the investment of the $3,000,000 paid in by the complainants on the twentieth of June, 1881. *First,* in the "5-20 bonds" of the state, as rapidly as they were subject to call; *second,* any portion of said fund that could not be invested in the 5-20 option bonds because none were subject to call, was to be invested in bonds either of the state or of the United States. I think a perfectly fair basis of settlement would be to hold the state liable for whatever could have been saved by the prompt execution of said act by taking up such 5-20 option bonds of the state as were subject to call when the money was paid to the state, and investing the remainder of the fund in the bonds of the United States at the market rates. Upon this basis a calculation can be made and the exact sum still to be paid by the complainants, in order to fully indemnify and protect the state, can be ascertained. For the purpose of stating an account upon this basis, and of determining the sum to be paid by the complainants to the state, the cause will be referred to John K. Cravens, one of the masters of this court. The said master will examine and consider the proofs on file, and, if necessary, will take further testimony upon the subject of this reference, and will report to the next term of the court. In determining the time when the investment should have been made under the act of March, 1881, the master will allow a reasonable period from the time of the receipt of said sum of $3,000,000 by the treasurer of the state—that is to say, such time as would have been required for that purpose had the officers charged with the duty of making said investment used reasonable diligence in its discharge.

The Hannibal & St. Joseph Railroad is advertised for sale for the amount of the installment of interest due January 1, 1882, which installment amounts to less than the sum which the company must pay in order to discharge its liability to the state, upon the theory of this opinion.

The order will therefore be that an injunction be granted to enjoin the sale of the road upon the payment of the said installment of interest due January 1, 1882, and, if such payment is made, the master will take it into account in making the computation above mentioned.