(C. D. 305)

ERNEST E. MARKS CO., A CORPORATION *v.* UNITED STATES

United States Customs Court, Third Division

(Decided March 21, 1940)

*Campbell, Clithero & Fischer* (*J. Milton Guy* of counsel), *James L. Gerry,* and *Barnes, Richardson & Colburn* for the plaintiff.

*Webster J. Oliver,* Assistant Attorney General (*Samuel D. Spector* and *Charles J. Miville,* special attorneys), for the defendant.

Before CLINE, EVANS, and KEEFE, Judges

EVANS, Judge: This is a suit against the United States wherein the importer seeks to recover certain sums of money claimed to have been exacted upon a cargo of corn raised in Argentina, imported from Canada, and entered at the port of Chicago. The merchandise is assessed at the rate of 25 cents per bushel under paragraph 724 of the Tariff Act of 1930. The importer makes claims for various rates of duty lower than 25 cents per bushel, all based upon the theory that because of the existence of a treaty between Argentina and the United States of America corn produced in Argentina is to have the rate of duty "generalized" to all other countries by virtue of the provisions of section 350 (a) of the Tariff Act of 1930, approved June 12, 1934, as amended, and the Cuban Trade Agreement made under authority of the last-named act, consummated August 24, 1934. We herewith copy the protest and amendment thereto as follows:

We claim that these goods are dutiable under the provisions of paragraph 724 of the Tariff Act of 1930.

We claim that said merchandise is properly dutiable at 12½ cents per bushel, or at 10 cents per bushel under and by virtue of the provisions of existing treaties between the United States and the country of exportation, the Convention of Commercial Reciprocity of 1902 between Cuba and the United States, the Reciprocal Trade Agreement or Treaty of August 24, 1934 between Cuba and the United States, and Section 350 (a) of the Tariff Act of 1930.

We further alternatively claim that under Section 350 (a) of the Tariff Act of 1930, as amended, the corn in question is dutiable at 22½ cents per bushel.

We further claim that the assessment of duties made herein is illegal and void.

It is alternatively claimed that the merchandise is dutiable at 10 per cent or 20 per cent ad valorem under paragraph 1558 of the Tariff Act of 1930.

We further claim that the merchandise is dutiable as claimed directly, indirectly, or by similitude under par. 1559.

### (Amendment)

It is claimed further in the alternative that the merchandise covered by the above-entitled protest is properly dutiable at 15¢ per bushel, or 16¢ per bushel, or 19¢ per bushel, or 20¢ per bushel, or 21¢ per bushel, all of the foregoing by virtue of the provisions of existing treaties between the United States and the country of exportation, the Convention of Commercial Reciprocity of 1902 between Cuba and the United States, the Reciprocal Trade Agreement or Treaty of August 24, 1934 between Cuba and the United States, and Section 350 (a) of the Tariff Act of 1930.

The importer in his argument makes the following statement:

The central proposition under our second contention, II, arises in this way:

(a) Since the Cuban Trade Agreement of 1934 reduced the duty upon corn imported from Cuba into the United States, this rate reduction pursuant to the generalization provision of Section 350 (a) 2 automatically applied to importations of corn from other nations, including Argentina.

(b) By reason thereof the protestant here would unquestionably be entitled to the benefit of such reduction, excepting (as it has been contended by the defendant) for paragraph (b) of Section 350, which paragraph has been incorrectly assumed to

have authorized the President to make such reductions exclusively preferential to Cuba, and therefore not applicable to importations from other countries.

(c) However, said paragraph (b) clearly does not *authorize* any such exclusive preferential to Cuba. In fact, paragraph (b) does not purport to authorize anything. It merely provides that Section 350 shall not *prevent* the application of the previous 1902 agreement with Cuba, or *preclude* giving effect to some modification thereof.

(d) Therefore, the President not having been authorized by Congress to make the Cuban reduction preferential to Cuba, the reduction is not preferential in any part, and consequently must be generalized to all other non-discriminating nations pursuant to the generalization provision of Paragraph (a), Sub-paragraph 2, of said section, and also pursuant to favored nation treaties.

(e) The reduction itself having been authorized by Congress, is valid and operative. The purported preferential feature of the trade agreement, not having been authorized by Congress, is invalid and must be disregarded.

Our central proposition under our third contention, III, is that Section 350 (b), if it has any affirmative significance, is an unlawful delegation of legislative power to the executive, and is, therefore, unconstitutional and void.

The importer further claims that in the protest previously presented to the Customs Court involving the question of the proper duty to be paid on corn imported from Argentina "certain legal principles which we set forth below under our second and third contentions of 'Argument,' were not set forth, and to our knowledge, have not, at any time, been presented to any court."

Section 350 of the tariff act, *supra*, was extended by joint resolution of Congress on March 1, 1937, which reads as follows:

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled*, That the period during which the President is authorized to enter into foreign-trade agreements under section 350 of the Tariff Act of 1930, as amended by the Act (Public, Numbered 316, Seventy-third Congress) approved June 12, 1934, is hereby extended for a further period of three years from June 12, 1937.

Pursuant to the authority of that act the President proclaimed, under date of August 24, 1934, a trade agreement with Cuba (T. D. 47232). We copy herewith article III and parts of schedule II applicable to the commodity imported, as well as article XVI of said treaty.

### ARTICLE III

Articles the growth, produce, or manufacture of the Republic of Cuba, enumerated and described in Schedule II annexed hereto and made a part of this Agreement, shall, on their importation into the United States of America, be granted exclusive and preferential reductions in duties not less than the percentages specified respectively in Column 1 of the said Schedule, such percentages of reduction being applied to the lowest rates of duty, respectively, now or hereafter payable on like articles the growth, produce, or manufacture of any other foreign country

No article the growth, produce, or manufacture of the Republic of Cuba, enumerated and described in Schedule II annexed hereto, with respect to which a rate of duty is specified in Column 2 of the said Schedule, shall in any case,

except as provided in Article VIII or X, be subject to any customs duty in excess of the rate so specified.

Every article the growth, produce, or manufacture of the Republic of Cuba which is not provided for in Article I, and which is not enumerated and described in Schedule II annexed to this Agreement, shall, on importation into the United States of America, be granted an exclusive and preferential reduction in duty of not less than 20 per centum, such percentage of reduction being applied to the lowest rate of duty now or hereafter payable on the like article the growth, produce, or manufacture of any other foreign country.

### ARTICLE XVI

The operation of the provisions of the Commercial Convention, concluded between the United States of America and the Republic of Cuba on December 11, 1902, shall be suspended on the day on which the present Agreement comes into force. In the event of the expiration or the denunciation of the present Agreement, the provisions of the aforesaid Convention of 1902 shall automatically resume operation and shall continue in full force and effect as provided therein until the expiration of one year from the day on which the Government of either country shall have given notice to the other Government of an intention to terminate it.

### SCHEDULE II

| Tariff Act of 1930 par. | Description of articles | Column 1 Minimum preferential reduction to Cuba | Column 2 Maximum rates of duty. Specific rates in United States dollars |
|---|---|---|---|
| * * * | * * * | * * * | * * * |
| 724 | Corn or maize, including cracked corn | 20% | 0.10 per bushel of 56 pounds |
| * * * | * * * | * * * | * * * |

Under date of July 27, 1853, the Government of the United States entered into a treaty with Argentina, which treaty was ratified April 9, 1855 (10 St. L. 1005). We copy herewith Articles III and IV of the treaty between these high contracting parties.

### ARTICLE III

The two high-contracting parties agree that any favor, exemption, privilege, or immunity whatever, in matters of commerce or navigation, which either of them has actually granted, or may hereafter grant, to the citizens or subjects of any other government, nation, or State, shall extend, in identity of cases and circumstances, to the citizens of the other contracting party, gratuitously, if the concession in favor of that other government, nation, or State, shall have been gratuitous; or, in return for an equivalent compensation, if the concession shall have been conditional.

### ARTICLE IV

No higher or other duties shall be imposed on the importation into the territories of either of the two contracting parties, of any article of the growth, produce, or manufacture of the territories of the other contracting party, than are, or shall be, payable on the like article of any other foreign country; nor shall any other or higher duties or charges be imposed in the territories of either of the contracting parties, on the exportation of any article to the territories of the other, than such

as are, or shall be, payable on the exportation of the like article to any other foreign country; nor shall any prohibition be imposed upon, the importation or exportation of any article of the growth, produce, or manufacture of the territories of either of the contracting parties, to or from the territories of the other, which shall not equally extend to the like article of any other foreign country.

Under the first contention the importer's attorney states, among other things:

The only portion of the reduction in the duty rate upon imports from Cuba which the amendment to the Tariff Act of 1934 authorized, or for which the Trade Agreement provided, which was exclusively preferential to Cuba, was twenty per cent below the lowest rate charged upon exportations from any other nation. The maximum rate of duty upon corn according to the Cuban Trade Agreement of 1934 was 10 cents per bushel. If this maximum rate is to reflect a twenty per cent exclusively preferential discount, then 10 cents per bushel must be eighty per cent of the general rate. The duty rate upon corn imported from all other non-discriminating or favored treaty nations was therefore fixed at 12½ cents per bushel.

Thereafter he outlines eight points which he frankly confesses were fully considered in the *Burke* case, *post.* We quote:

1. The foregoing points, 1 through 8, were fully considered in the *Burke* case, which involved a state of facts somewhat similar to those in the case at bar; the commodity was rum imported from Great Britain. These points, therefore, while repeated here, are not argued.

2. The essence of these points is that the exclusive percentages of reduction in favor of Cuban exports, set forth in Column 1 of Schedule II of the Trade Agreement of 1934, when made applicable to the lowest rates of duties payable by any other foreign country, established maximum *exclusive* rates payable by Cuba, and necessarily thereby establish the maximum rates of duty payable upon imports from any other foreign nation. Thus, the Cuban Trade Argeement, interpreted in the light of the authorization therefor contained in the Act of 1934, amounted to an agreement with Cuba, that, no matter what the duty rate on corn should be as fixed by the Congress, or by the President pursuant to Section 350, the duty on Cuban exports would not be more than 20 per cent less than the duty on exports from any other foreign country. Hence, when the Cuban agreement in Column 2 fixed the duty on corn from Cuba at the rate of 10 cents per bushel, its 20 per cent preferential treatment automatically placed the duty on exports from all other foreign nations at 12½ cents per bushel. Paragraph (a) of Section 350, together with treaties made with other foreign nations, provided that they should not be obligated to pay more than 25 per cent above the Cuban rate fixed at 10 cents per bushel, or 12½ cents per bushel.

In the *Burke* case this court was affirmed and it is reported as C. A. D. 44, Volume 26, page 374 of the United States Court of Customs and Patent Appeals. (See *E. & J. Burke, Ltd.* v. *United States,* T. D. 49359, 73 Treas. Dec. 115, for decision of this court.)

Points 9 and 10 urged by the plaintiff under the first contention are as follows:

Point 9.

Column 2 of Schedule II of the Trade Agreement does not provide that the rates therein are preferential. Column 1 does provide in its caption that the rates therein are preferential. The language of the heading of Column 1, prop-

erly read, is, "minimum reduction to Cuba, this reduction being preferential." The word "preferential" clearly modifies "reduction." "Minimum" does not modify "preferential." If the Schedule, Column 2, had been intended to create preferentials, that word would have been inserted in the caption to Column 2, as it was in Column 1.

### Point 10.

Section 350 did not authorize that the Cuban reduction be exclusive to the extent of more than twenty per cent. If the Cuban Agreement purported to authorize an exclusive preferential of more than 20 per cent, to the extent of the excess, the excess preferential was not authorized by Congress and was therefore null and void.

Counsel for the plaintiff insists that the last-named points urge something new that had not been considered by the Court of Customs and Patent Appeals in the previous decisions involving the interpretation of the Cuban Trade Agreement in connection with controversies passed on similar to the ones raised herein. We cannot agree with that viewpoint. Concerning the theory urged in Point 9, that the omission of the term "preferential" from the heading of column 2 of schedule II renders the rates therein nonpreferential, we call attention to the language of the court in *F. H. Von Damm* v. *United States,* 25 C. C. P. A. (Customs) 97, T. D. 49094, where, at page 106, after demonstrating the fallacy of such a theory, it said:

It seems to us that the Cuban agreement embodies a practicable plan for exclusive preferential duties on Cuban products, both by naming specific preferential duties and by preferential reduction percentages, and is clearly within the authority conferred upon the President by the Reciprocal Tariff Act.

### As to point 10 plaintiff's counsel argues as follows:

1. Section 350 (b), (pages 6, 7, par. 2 of this brief), first apparently contemplates the continuance of the 1902 preferential, then provides that Section (a) does not *"preclude* giving effect to an exclusive agreement with Cuba *concluded under this section."* If it is concluded under Section 350 (a) 2 it is concluded under a section which contains the proviso that the reduction accorded Cuba shall be generalized. The reduction cannot at once be exclusive and be generalized, yet that is the inescapable result of a holding that the whole of the reduction to 10 cents a bushel is preferential. In their application to the Cuban Trade Agreement (unless the Court holds that only the 20 per cent reduction is preferential), paragraphs (a) 2 and (b) are utterly irreconcilable, and therefore (b), as the proviso to (a), must be held void under the authorities later cited herein (pages 39, 40, 41 of this brief). However, the Courts will not hold a statute or a portion thereof void if a reasonable construction can avoid that consequence. This can be done in this case, by not treating the entire reduction as preferential.

2. Where two statutes, or provisions of one statute, in their operative effect are repugnant, certain presumptions arise. There is a presumption against inconsistency, and a construction will be adopted which will make all provisions of a statute consistent with each other if possible. *People* v. *Briggs,* 50 N. Y. 553; Black, Construction of Laws, 3rd Ed. 385.

3. There is a presumption against impossibility, and the courts will adopt a construction which will not require that a reduction to Cuba shall be generalized to

foreign nations and still be exclusively preferential to Cuba. *People, for Use of Hall* v. *Admire*, 39 Ill. 251; Broom, Max. 242.

4. There is a presumption against absurdity (*i. e.*, of the paradox of a generalized exclusive preferential). *Oates* v. *First National Bank*, 100 U. S. 239.

5. There is a presumption against repugnancy; against the effect of one statute or section thereof defeating another. *The Emily and the Caroline*, 9 Wheat. 381.

6. All of the incongruities, illegalities, and perplexities otherwise arising from an attempted coordination of Section 350 (a) 2, Section 350 (b), and the Trade Agreement, may be simply, logically, and legally resolved, by the construction that the specified maximum duty rate of 10 cents per bushel is preferential only to the extent of 20 per cent.

The fallacy of the importer's position as to point 10 consists in the claim that paragraphs (a) and (b) of section 350, *supra*, are in conflict or such as cannot be reconciled. It must be remembered that both (a) and (b) are of equal legislative status, that is as to say they are coordinate paragraphs of the same act; (a) contains general authority for making trade agreements, while (b) was intended to protect the Cuban preferential guaranteed by the Reciprocity Treaty of 1902, and at the same time gave authority to the President to modify the preference granted by said treaty within the limits defined. This view is expressed in the *Von Damm* case, *supra*, at page 104, where the court states:

We have no doubt that, as thus analyzed, section 350 (b) authorizes the President to enter into a reciprocal trade agreement with Cuba modifying the preference granted by the Commercial Reciprocity Treaty by according to Cuba changes in the 20 per centum preferential rate and by fixing preferential specific duties.

The major contentions numbered II and III as set out in the plaintiff's brief are as follows:

### II: SECOND CONTENTION.

Section 350 did not authorize the President to place, in trade agreements with Cuba (which trade agreements the act DID authorize) ANY provision granting exclusively preferential treatment to Cuba. If the Trade Agreement of 1934, which was effected pursuant to Section 350, purported to grant unto Cuba any exclusive preferential, such purported exclusive in the Trade Agreement was not authorized, and is therefore absolutely void and of no effect. The nonexclusive reduction, however, WAS authorized in Section 350 (a) by Congress, and hence must be generalized to other nations. The exclusive feature, only, of the Trade Agreement is void; the balance of the agreement is valid and operative.

### CONTENTION III.

Section 350 (b) is unconstitutional and void if construed to have any affirmative significance. It will, therefore, be construed to be only a proviso, declaratory of that congressional intent which is described in Contentions I or II.

The brief also assumes to distinguish between the second contention and the previously stated contentions as follows:

1. To restate the distinction between the plaintiff's first contention, No. 1, above, and this contention, II: We say under No. 1 that even if a reduction in the duty rates was effectively made exclusively preferential to Cuba, the resultant rate could be preferential only to the extent of 20 per cent thereof.

2. Our alternative theory under this contention, No. II, is: No authority was granted the President by Section 350 to grant any exclusively preferential treatment to Cuba of any character whatsoever, not even 20 per cent.

Further in paragraph 5 of page 18 of the brief we find the following statement:

5. In the *Von Damm* and *Burke* cases, the Courts, the Attorney General, and the importers, all assumed that the 1934 Act and consequent Trade Agreement entitled importers from Cuba to at least *some* preferential discount; the Government contending that this "some" was the whole of the discount, the importers contending that it was only such portion as would leave Cuba a 20 per cent preferential. We here assert the proposition, which no one has apparently previously considered, that said act authorized *no* preferential discount, and if the trade agreement purported to grant the same, such purported preferential was null and void. This is the gist of our second alternative theory. [Italics quoted.]

With reference to contention III above quoted we observe the claim on page 54, paragraph 13 of the brief, as follows:

* * * if Paragraph (b) be deemed affirmatively efficacious, then beyond question it purports to vest in the Executive arbitrary and discriminatory powers of discretionary legislation, which by all of the decisions of our Courts is an unconstitutional delegation to him of legislative power.

The argument under this point concludes as follows:

14. In the case at bar, therefore, the Court has the alternative, either: (a), to construe Paragraph (b) as not giving any affirmative powers to the President, which is the construction claimed by us in our Contention II above, or, (b), to overrule our Contention II, hold that Paragraph (b) does purportedly authorize the execution of an exclusive preferential to Cuba, and thereby decree that Paragraph (b) is necessarily unconstitutional and void, and can have no force or effect of any character whatsoever.

It would seem unnecessary to undertake any additional statement as to the effect of paragraphs (a) and (b) of the trade agreement act, nor do we believe it is possible to make any clearer exposition of the effect of the language there used than has already been made, particularly as stated in the *Von Damm* case, *supra*. These two coordinate paragraphs of the act must be read together and construed in *pari materia*. The importer does not question the authority granted in paragraph (a) but he does claim, as we understand it, that paragraph (b) grants no affirmative authority; that it acts only as a limitation or proviso in its effect upon the authority conveyed in paragraph (a) of the act. On this phase of the question we feel that we might well quote from the *Burke* case, *supra*, where we find, at page 378, a statement which we think apropos to the situation here.

We cannot agree with appellant's counsel that in the case at bar "pertinent questions of law and of construction" are presented which were not raised or discussed or passed upon by this court in the *Von Damm* case, *supra;* but on the contrary, every question here presented, except the application of the most-favored-nation clauses of certain treaties, was in that case presented, considered, and decided.

There is another principle of construction availed of with relation to statutes affecting the public interest that might be applicable to that provision of paragraph (b) which states that:

Nothing in this section shall be construed to prevent the application, with respect to rates of duty established under this section pursuant to agreement with countries other than Cuba, of the provisions of the treaty of commercial reciprocity concluded between the United States and the Republic of Cuba on December 11, 1902, or to preclude giving effect to an exclusive agreement with Cuba concluded under this section, modifying the existing preferential customs treatment of any article the growth, produce, or manufacture of Cuba:  *  *  *

No one can gainsay but that such language is permissive in nature. In our opinion it carries implied authority. We observe in Beal's "Cardinal Rules of Legal Interpretation" the following statement, at page 328:

### Permissive, Directory, or Enabling Words

It has been so often decided as to have become an axiom, that in public statutes words only directory, permissory, or enabling, may have a compulsory force where the thing to be done is for the public benefit or in the advancement of public justice.   (Citing cases.)

While that rule is laid down by English decisions, we find the federal court has applied the same rule. In *Ralston and others, Trustees* v. *Crittenden, Governor, and others,* 13 Fed. 508, a decision rendered by the Circuit Court of the Western District of Missouri, the learned judge at page 512, states the principle in the following language:

*  *  *  Even if the terms of the statute were permissive only, and meant no more than the words generally employed in statutes importing a grant of authority or power to a public officer to do a certain act, still it is well settled that all such acts are to be construed as mandatory, whenever the public interests *or individual rights* call for the exercise of the power conferred. *Sup'rs* v. *U. S.* 4 Wall. 435; *Galena* v. *Amy,* 5 Wall. 705; *McDougall* v. *Peterson,* 11 C. B. 755; 15 Op. Atty. Gen. U. S. 621.

We are of the opinion that paragraph (b) in connection with paragraph (a) authorizes the President to make a trade agreement in the manner adopted and with the legal effect as defined in the seven different cases decided by the Court of Customs and Patent Appeals, the two leading cases of which were carried to the Supreme Court where a writ of certiorari was denied.

This court has decided most of the questions raised herein at least twelve times, all adversely to the contentions here made by the plaintiff. While it is within the privilege of an attorney to question the construction of statutes as laid down by appellate courts, it is the duty of a *nisi prius* court to follow the interpretation placed upon the statute by a superior court. Nothing has been presented in this record that warrants us in even questioning the wisdom of the decisions heretofore made, to say nothing of attempting to render a decision

adverse to such holdings. If the statute carries an unwarranted, unlawful, and unconstitutional delegation of legislative power, it is for the superior courts to so declare unless the defect is palpably evident.

The Congress of the United States has renewed the trade agreement act subsequent to the interpretations given by the appellate court in most of the decided cases referred to in the brief of plaintiff, thus in effect adopting the views entertained by the court. If the court had any doubt that Congress had laid down a sufficient rule by which the President should be guided and which should limit his action, it is our opinion that this, an inferior court, should resolve that doubt in favor of the constitutionality of the act of Congress.

On the question of a conflict with the treaty entered into between the United States and Argentina, it would seem unnecessary, in the view we have adopted, to further discuss that proposition. We have quoted two articles of the treaty in question which show conclusively that it was of the class of treaties known as conditional most-favored-nation treaties. In the case of *Louis Wolf & Co.* v. *United States*, 27 C. C. P. A. (Customs) 188 C. A. D. 84, the court had under consideration the effect of a treaty with Japan which contained the conditional form of the most-favored-nation clause, the terms of which were similar to the terms of the Argentine treaty quoted above. The court there held that the treaty with Japan did not require the extension to that country of the preferential reductions granted to Cuba in her trade agreement, for well-established reasons as stated in the case of *Bartram* v. *Robertson*, 122 U. S. 116, and *Whitney* v. *Robertson*, 124 U. S. 190. Following that ruling we hold that the treaty with Argentina does not require that the rates of duty on corn granted to Cuba in the trade agreement made between the United States and Cuba, *supra*, be extended to Argentina.

For the foregoing reasons the plaintiff's claims are overruled.

Judgment will be rendered accordingly. It is so ordered.